# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| Stephen Cordry d/b/a )<br>Cordry Mobile Homes, )<br>)<br>　　　　Plaintiff, )<br>)<br>v. )<br>)<br>Vanderbilt Mortgage & Finance, Inc., )<br>)<br>　　　　Defendant. ) | Civil Action Number<br>03-3267-CV-S-JTM |

## ORDER

Pending before the Court are *Plaintiff's Motion For Summary Judgment*, filed March 11, 2005 (Doc. #105) and *Defendant's Motion For Summary Judgment On Each Of Plaintiff's Claims And As To Each Of Defendant's Counterclaims*, filed March 11, 2005 (Doc. #102).

### I. Claims Asserted in the PETITION

The parties are in general agreement about many salient facts regarding the issues raised in the underlying PETITION. Plaintiff Stephen Cordry d/b/a Cordry Mobile Homes ("Cordry") operates a manufactured home retail lot in Lebanon, Missouri. As is apparently typical in the manufactured home sales industry, Cordry employed "floorplan financing." With this plan, a financial institution lends to a manufactured home dealer a certain percentage of the value of a manufactured home in exchange for the repayment of the loan (with interest) when the dealer sells the manufactured home. The percentage of the cost supplied by the financial institution usually varies on the condition of the manufactured home (*e.g.*, a bank may advance 100% of the

cost of a new manufactured home). The financial institution maintains a security interest in the financed manufactured homes.

In approximately November of 2001, Cordry began obtaining floorplan financing from Deutsche Financial Services Corporation ("DFS") for both new and used manufactured homes. The agreement between Cordry and DFS with regard to new manufactured homes was memorialized in an AGREEMENT FOR WHOLESALE FINANCE ("the AGREEMENT"). The AGREEMENT, however, stated that the amount of funding to be provided for used manufactured home purchases would be set out in a separate writing. To that end, on November 30, 2001, Cordry and DFS entered into an ADDENDUM TO AGREEMENT FOR WHOLESALE FINANCING ("the ADDENDUM") with regard to used manufactured homes. Pursuant to the ADDENDUM, with regard to the financing of manufactured homes that were no more than ten years old, Cordry and DFS agreed:

> DFS, in its sole discretion, may loan to [Cordry] an amount up to: (a) Sixty-Five percent (65%) of the Base NADA wholesale value, excluding the value of any added accessories, of Used Manufactured Homes which are no more than five (5) model years old, inclusive of the current model year; and (b) Sixty percent (60%) of the Base NADA wholesale value, excluding the value of any added accessories, of Used Manufactured Homes which are between six (6) and ten (10) model years old, inclusive of the current model year.

ADDENDUM ¶ 1.2.

Sometime prior to November 13, 2002, through a series of assignments, the floorplan financing arrangement for Cordry was assumed by defendant Vanderbilt Mortgage & Finance, Inc. ("Vanderbilt"). Cordry authorized the assignment to Vanderbilt based on the express understanding that:

2

> Vanderbilt [would] continue to extend a credit facility to [Cordry]
> under the same credit line[1] which DFS [had] provided to [Cordry],
> and under the same terms and conditions of the dealer agreements
> originally between DFS and [Cordry] (as long as [Cordry] is in
> compliance with all terms and conditions).

Letter of Direction (11/13/2002). The parties do not dispute that Vanderbilt provided financing to Cordry for the purchase of new manufactured homes in compliance with the AGREEMENT. The initial dispute between the parties concerns Vanderbilt's financing of used manufactured homes for Cordry.

On January 21, 2003, Cordry requested that Vanderbilt finance four used manufactured homes. In this request, Cordry asserted that he was seeking financing for:

(1) a 1999 manufactured home with a NADA blue book value of $12,500.00;

(2) a 1998 manufactured home with a NADA blue book value of $11,000.00;

(3) a 1994 manufactured home with a NADA blue book value of $9,000.00; and

(4) a 1997 manufactured home with a NADA blue book value of $7,000.00.

In response to Cordry's request, Vanderbilt apparently responded by offering a total of $12,500.00 for financing on three of the manufactured homes and offering no financing on one of the units. Cordry alleges that this financing offer computes to only 35% of the value that DFS would have utilized to calculate floorplan financing.

---

[1] With DFS and, later, Vanderbilt, Cordry had a $925,000.00 line of credit available for the purchase of new manufactured homes and a $75,000.00 line of credit for the purchase of used manufactured homes.

Consequently, Cordry alleges that Vanderbilt breached its obligations to Cordry resulting in over $1,000,000.00 in damages to Cordry. More specifically, Cordry has asserted claims against Vanderbilt for breach of contract [Count I], fraudulent misrepresentation [Count II], negligent misrepresentation [Count III], breach of the covenant of good faith and fair dealing [Count IV], interference with contractual relations [Count V], and interference with business expectancies [Count VI]. With regard to those claims, Cordry has moved for an affirmative summary judgment on Counts I-IV, while Vanderbilt has moved for defensive summary judgment on all counts.

### A. Breach of contract [Count I of Cordry's PETITION]

In seeking summary judgment on his breach of contract claim, Cordry asserts that Vanderbilt breached its legal obligations in (1) using a different figure for "Base NADA wholesale value" than had been used by Cordry and DFS, and (2) failing to offer financing "for used mobile homes at a rate of sixty-five percent (65%) for homes that were five (5) years or less model years old and sixty percent (60%) for homes that were six (6) to ten (10) model years old." Vanderbilt counters Cordry's request for summary judgment and seeks summary judgment for itself by arguing that:

> any dispute over the definition of "Base NADA wholesale value" is meaningless inasmuch as the AGREEMENT and the ADDENDUM expressly vest Vanderbilt with "sole discretion" to make loans to Cordry and that, in exercising such discretion, Vanderbilt "may loan" to Cordry "an amount up to" the 65% or 60% figure.

After reviewing the cross-motions for summary judgment of the breach of contract claim, and bearing in mind the obligations under FED. R. CIV. P. 56, the Court agrees with Vanderbilt. The AGREEMENT and the ADDENDUM expressly state that Vanderbilt (as DFS' assignee) has

4

"sole discretion" to determine the amount of financing and if financing should be made available at all. Moreover, the ADDENDUM expressly states that any financing provided by Vanderbilt (as DFS' assignee) would be in an amount not to exceed the 65% and 60% cut-offs. Consequently, the business decision of Vanderbilt not to finance or to finance at an amount less than the 65% and 60% cut-offs is expressly permissible under the AGREEMENT and the ADDENDUM and thus cannot constitute a breach of the AGREEMENT and the ADDENDUM, so long as Vanderbilt acted in good faith and fair dealing (discussed *infra*).

In reaching this conclusion, the Court finds that the previous "course of dealing" between Cordry and DFS does not alter the finding of no breach of contract. Even accepting Cordry's contention that DFS always loaned out money at the maximum amount of the 65% and 60% cut-offs, this merely demonstrates how DFS chose to exercise its discretion under the AGREEMENT and the ADDENDUM in those particular lending cases. That prior conduct did not prevent Vanderbilt (or DFS had it not assigned away its rights) from exercising discretion and lending different amounts for later financing opportunities. The use of "discretion" in the ADDENDUM is not ambiguous and must be enforced for its obvious meaning. *Compare Missouri Consolodated Health Care Plan v. Community Health Plan*, 81 S.W.3d 34, 48 (Mo. App. [W.D.] 2002) ("By granting them discretion, the contract granted [the party] the power to say no to [the other party's] request . . . . To conclude otherwise would render 'discretion' meaningless."). As a result, even if the parties disagree as to which figure represents the "Base NADA wholesale value,"[2] such disagreement did not cause any breach in light of Vanderbilt's discretionary decision to loan out less than the 65% and 60% cut-offs.

---

[2] Essentially, Cordry argues that the term, as applied between DFS and him, really referred to the "retail" value listed in NADA

5

In any event, the Court does not find any ambiguity in the term "Base NADA wholesale value" and agrees with Vanderbilt that the plain meaning of the term is stated expressly in the NADA appraisal guide:

> ["Wholesale value" is] the amount a RETAILER would reasonably pay for a used home. This value depends on the circumstances under which the home is offered for sale. This guideline shows how various circumstances affect the wholesale value. (A value less than retail book value, but not A.C.V. – Actual Cash Value).

N.A.D.A. MANUFACTURED HOUSING APPRAISAL GUIDE, Part 3, p. 8. The NADA appraisal guide then sets out formulae for reducing retail value to reflect the appropriate "wholesale value" in various circumstances *Id.*[3]

In response, Cordry argues that this was not the method employed by DFS and this prior "course of dealing" with DFS should be utilized by the Court to interpret the ambiguous phrase "Base NADA wholesale value." As noted, however, the Court does not find the term ambiguous and thus does not need to examine the prior course of dealing. *See*, *e.g.*, *SAB Harmon Industries, Inc. v. All State Building Systems, Inc.*, 733 S.W.2d 476, 486 (Mo. App. [W.D.] 1987) ("A course of dealing yields to an express term in the contract which is contrary."). Moreover, Cordry's "course of dealing" argument is greatly diminished by the fact that the AGREEMENT specifically provides:

> The express terms of this Agreement will not be modified by any course of dealing, usage of trade, or custom of trade which may deviate from the terms hereof.

---

[3] The DFS employees responsible for financing with Cordry, Jason Sanchez and Randy McFall, testified that they simply used the retail number in the NADA appraisal guide and they were not even aware of the provisions in the book for reducing retail value to reflect wholesale value.

6

AGREEMENT ¶25. If the Court were to utilize Cordry's "course of dealing" analysis, it would have to effectively delete the word "wholesale" from the phrase "Base NADA wholesale value."

In sum, the Court does not find that Vanderbilt breached the AGREEMENT and/or the ADDENDUM in its response to Cordry's January 21, 2003 request for floorplan financing on the four used manufactured homes. Consequently, the Court denies Cordray's motion for summary judgment on Count I of his PETITION and the Court grants Vanderbilt's motion for summary judgment on Count I of the PETITION.

### B. Fraudulent and negligent misrepresentation
**[Counts II and III of Cordry's PETITION]**

Under Missouri law, a claim of fraudulent misrepresentation requires a plaintiff to demonstrate:

> (1) a representation,
>
> (2) its falsity,
>
> (3) its materiality,
>
> (4) the speaker's knowledge of the falsity of the representation,
>
> (5) the speaker's intent that it be acted on by the hearer and in the manner reasonably contemplated,
>
> (6) the hearer's ignorance of the falsity of the representation,
>
> (7) the hearer's reliance on the truth of the representation,
>
> (8) the hearer's right to rely on the representation, and
>
> (9) the hearer's consequent and resulting injury.

*Joel Bianco Kawasaki Plus v. Meramec Valley Bank*, 81 S.W.3d 528, 536 (Mo. 2002) (*en banc*). A claim for negligent misrepresentation is very similar except that instead of the speaker "knowing" the representation is false, the speaker's "failure to exercise reasonable care or competence in obtaining or communicating the information" leads to the negligent dissemination of a false representation. *M & H Enterprises v. Tri-State Delta Chemicals, Inc.*, 35 S.W.3d 899, 904 (Mo. App. [S.D.] 2001).

Under both theories of liability, Cordry asserts that Vanderbilt made a false representation when it represented that it would "continue to extend a credit facility to [Cordry] under the same credit line which DFS has provided to [Cordry], and the same terms and conditions." The initial issue – under both theories – is whether this representation is false. Cordry's summary judgment evidence of falsity is contained in a single sentence:

> As discussed in [the breach of contract argument], and incorporated herein, the representation was clearly false.

As acknowledged by Cordry, his claim of a false representation is tied directly to his claim that Vanderbilt breached the AGREEMENT and the ADDENDUM. As discussed *supra*, the Court has concluded that Vanderbilt did not breach the AGREEMENT and the ADDENDUM.

More problematic for Cordry, at least with regard to any claim of fraudulent misrepresentation, is his lack of any evidence sufficient under FED. R. CIV. P. 56 to demonstrate that Vanderbilt knowingly made a false representation. At best, Cordry's evidence demonstrates that Vanderbilt was less than fully diligent in learning about the actual business practices of DFS in dealing with Cordry. Accordingly, under the circumstances presented by the parties,[4] the

---

[4] For instance, the result might have been different if Cordry had presented "significant probative evidence" under FED. R. CIV. P. 56 that Vanderbilt had represented to

Court also must conclude that Cordray's motion for summary judgment on fraudulent misrepresentation as asserted in Count II of his PETITION must be denied and the Court must grant Vanderbilt's motion for summary judgment on Count II of the PETITION.

The matter of negligent misrepresentation is less clear cut. The issue in this regard comes down to whether Vanderbilt failed to exercise reasonable care or competence in communicating the information to Cordry that it would "continue to extend a credit facility to [Cordry] under the same credit line which DFS has provided to [Cordry], and the same terms and conditions." In support of this claim, Cordry points to the deposition testimony of David Bumpers, the Vanderbilt employee responsible for implementing the AGREEMENT and the ADDENDUM with Cordry. In his deposition, Mr. Bumpers testified:

> Q: Did you ever ask anyone at DFS what the definition of their wholesale book value was?
>
> A: No.
>
> Q: Is it – I guess it is your contention that the wholesale book value is as Vanderbilt has it the adjusted book value.
>
> A: It clearly is. That's the way this book defines it.

Based on this evidence, the Court concludes that there is not a submissible case of negligent misrepresentation. Vanderbilt felt that the Agreement and the Addendum were clear and

---

Cordry that it would definitely finance him at the maximum levels previously advanced by DFS <u>notwithstanding</u> the terms of the AGREEMENT and the ADDENDUM. In that case, Cordry could argue that there were false representations not dependent on a showing of breach of contract. In <u>this</u> case, however, Vanderbilt only represented that it would fulfill the obligations that DFS has under the AGREEMENT and the ADDENDUM by providing the same credit line (which it did) and under the same terms and conditions (which it did based on the express language in the AGREEMENT and the ADDENDUM).

unambiguous on their face. The Court agrees with that assessment. Under those circumstances, there was simply no reason for Vanderbilt to consult with DFS. As such, the Court also must conclude that Cordray's motion for summary judgment on negligent misrepresentation as asserted in Count III of his PETITION must be denied and the Court must grant Vanderbilt's motion for summary judgment on Count III of the PETITION.

The Court would note that it is not unsympathetic toward Cordry. He had a business relationship with DFS wherein DFS was loaning him money for used manufactured homes based on a percentage of the NADA <u>retail</u> value (instead of the wholesale value specified in the ADDENDUM). When Vanderbilt then offered lending at the <u>wholesale</u> value, Cordry was understandably dismayed. However, Cordry simply has not produced any evidence that Vanderbilt knew, or should have known, about DFS' approach to NADA values. In the absence of any such evidence, Vanderbilt cannot be found liable for performing within the plain language of the AGREEMENT and the ADDENDUM and Vanderbilt's representations cannot be found to be false or fraudulently or negligently made.

### C. Breach of the obligation of good faith and fair dealing
### [Count IV of Cordry's PETITION]

It is well-settled that "Missouri law implies a covenant of good faith and fair dealing in every contract." *Farmers' Electric Cooperative, Inc. v. Missouri Department of Corrections*, 977 S.W.2d 266, 271 (Mo. 1998) (*en banc*). A breach of these obligations occurs "when a party, in bad faith, utilize[s] contract language that allowed unilateral action to improperly deny the other party from the expected benefits flowing from the contract." *Koger v. Hartford Life Insurance Co.*, 28 S.W.3d 405, 412 (Mo. App. [W.D.] 2000). However, "good faith" does not impose a limitless duty or obligation and cannot "override the express terms of the agreement."

*Taylor Equipment Inc. v. John Deere Co.*, 98 F.3d 1028, 1031 (8th Cir. 1996) (applying South Dakota law).

Cordry argues that Vanderbilt violated its obligation of good faith and fair dealing in its financing proposal for the used manufactured homes in response to the January 21, 2003 request from Cordry. Cordry asserts:

> [Vanderbilt's] defense in this matter is that the Contract states that it can advance whatever amount it wants, if at all.

Vanderbilt counters that the bargained for AGREEMENT and ADDENDUM vested sole discretion in it and Vanderbilt cannot breach an obligation of good faith and fair dealing by exercising that sole discretion.

The Court finds the recent case of *Missouri Consolidated Health Care Plan v. Community Health Plan*, *supra*, 81 S.W.3d 34 (Mo. App. [W.D.] 2002) illustrative. In *Missouri Consolidated Health*, an HMO argued that a health care plan breached a contract, specifically arguing that the health care plan breached its implied covenant of good faith and fair dealing when the health care plan refused to permit the HMO to increase premiums.

It was undisputed that the "contract granted discretion to [the health care plan] to determine whether [the HMO] should be given a rate increase." *Id*. at 46. Nonetheless, the court noted that Missouri law still meant that the health care plan "was bound to exercise that discretion in good faith." *Id*. As such, the court held:

> To establish a breach of the covenant of good faith and fair dealing, [the HMO's] burden was to establish that [the health care plan] exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [the HMO] the expected benefit of the contract.

*Id*.

11

While the AGREEMENT and the ADDENDUM granted to Vanderbilt "sole discretion" regarding floorplan financing for used manufactured homes, it is clear that the mere granting of discretion did not grant Vanderbilt wholly unfettered, unreviewable decisionmaking. As such, the Court rejects the argument advanced by Vanderbilt in support of its motion for summary judgement that:

> There can be no violation of the obligation or duty of good faith and fair dealing when Vanderbilt exercises the bargained for discretionary power.

*Compare Missouri Consolidated Health Care*, 81 S.W.3d at 48 ("[The HMO] makes too much of the discretion element in the contract."). The ultimate issue, instead, is whether there is sufficient FED. R. CIV. P. 56 evidence of bad faith on Vanderbilt's part in exercising its discretion to raise a trialworthy issue. Cordry's pleadings again direct the Court to the deposition testimony of David Bumpers as evidence of bad faith.

> Q: You never asked anyone at DFS about the contract, you just went by the contract as to what it was? You just went by – you said earlier you just went by the contract you didn't talk to anybody at DFS about the contract between [Cordry] and DFS?
>
> A: No.

12

Without more evidence, the Court finds that the fact that Vanderbilt merely decided to "go by the contract" without talking with Cordrys' previous lender is not an adequate showing of bad faith. Even if Cordry is correct that this testimony demonstrates some "lack of diligence" by Vanderbilt, a mere lack of diligence is not the same as demonstrating "bad faith."

Equally unavailing is Cordry's allegation that Vanderbilt made its financing decision "without first determining . . . the terms of any contract that may govern the parties' relationship." While this statement certainly implies a possibility of bad faith, the evidence cited in support of the allegation is much more ambiguous. In his deposition, David Bumpers only testified:

> Q: Were there any other factors besides the ones[5] you listed earlier today [relied on by Vanderbilt in making financing decisions]?
>
> A: We were in business to do business, and, you know, we would look at situations daily, and, you know, a multitude of things that we did, floor planning new homes, floor planning used homes, collecting interest, collecting curtailments, handling everything that came up, and I would like to believe that we looked at every situation in a pro business perspective, and – and if there were circumstances or items in any of those that needed to be looked at to see if a different decision needed to be made to – to make something happen or not happen that we would do that, and, you know, to – to sit here and name, it would be impossible for me to do that.

Again this evidence, and the reasonable inferences to be drawn therefrom, simply does not create a trialworthy issue of bad faith.

---

[5] The only other factor discussed by Mr. Bumpers involved whether the dealer was "honoring their obligations on curtailments and interest."

13

Case 6:03-cv-03267-JTM   Document 148   Filed 05/24/05   Page 13 of 19

Based on the evidence contained in the summary judgment pleadings (as opposed to mere attorney argument and innuendo), the Court does not find that there is sufficient evidence to create a genuine issue of material fact as to whether Vanderbilt breached its covenant of good faith and fair dealing as implied by law in the AGREEMENT and/or the ADDENDUM in its response to Cordry's January 21, 2003 request for floorplan financing on the four used manufactured homes. Consequently, the Court denies Cordray's motion for summary judgment on Count IV of his PETITION and the Court grants Vanderbilt's motion for summary judgment on Count IV of the PETITION.

### D. Tortious interference with contractual relations and tortious interference with business expectancies
### [Counts V and VI of Cordry's PETITION]

Vanderbilt has moved for summary judgment on Cordry's claims of tortious interference with contractual relationships and tortious interference with business expectancies, Counts V and VI, respectively, of Cordry's PETITION. Both theories involve similar elements under Missouri law, to wit:

(1) a contract or valid business expectancy,

(2) the defendant's knowledge of the contract or relationship,

(3) a breach induced or caused by defendant's intentional interference,

(4) an absence of justification, and

(5) damages to the plaintiff.

*Rhodes Engineering v. Public Water Supply District No. 1 of Holt County*, 128 S.W.3d 550, 555 (Mo. App. [W.D.] 2004).

14

Vanderbilt contends that Cordry made admissions in his deposition that legally undercut any claim to either tortious interference claim. In his deposition, Cordry testified:

> Q: In November of 2002 when you're signing these letters that are attached to your lawsuit, was there any financing option or floor plan option that you didn't take because instead you were choosing to sign these documents with Vanderbilt?
>
> A: That I did not take because of them?
>
> Q: Yes, sir.
>
> A: No, ma'am.
>
> Q: So was there any other floor plan financier that you terminated an arrangement with because of what you did in these letters?
>
> A: No, ma'am. No, ma'am.

The Court concludes that this deposition testimony is far from clear cut. Moreover, in response to Vanderbilt's argument for summary judgment Cordry contends that his deposition testimony establishes that:

> [Cordry] opened a new lot based on the representation believing that he would have the floorplan financing to stock said lot; however, after [Vanderbilt's] representation proved to be false, [Cordry] lost his investment and lost a chance at a substantial profit.

In support of this assertion, Cordry cites to pages 16 and 36 of his deposition. Page 16 of the deposition does not contain relevant information to the assertion. On page 36 of his deposition, however, Cordry testified:

15

> Q: [A]t this point are you claiming that [Vanderbilt's] failure to finance certain used homes for your Camden lot have caused you damages at your Camden lot?
>
> A: Camdenton and/or Lebanon lot.
>
> Q: Camden and Lebanon lot?
>
> A: Correct.

The cited testimony does raise some question as to the damages Cordry believes were caused by Vanderbilt's financing decisions.

Nonetheless, the Court finds that Cordry is foreclosed on his tortious interference claims, not because of admissions in his deposition testimony as argued by Vanderbilt, but because he cannot demonstrate an absence of justification for Vanderbilt's actions.

> A plaintiff has the burden of producing substantial evidence to establish absence of justification. An absence of justification is the absence of any legal right on the part of the defendant to take the action about which a plaintiff complains.

*Chandler v. Allen*, 108 S.W.3d 756, 760 (Mo. App. [W.D.] 2003). As set out previously, the Court has found that Vanderbilt acted within the terms and conditions of the AGREEMENT and the ADDENDUM with Cordry. Consequently, those actions were not taken without justification and those actions cannot legally constitute tortious interference. The Court grants Vanderbilt's motion for summary judgment on Counts V and VI of Cordry's PETITION.

## II. Vanderbilt's Counterclaim

In addition to moving for summary judgment on Cordry's claims, Vanderbilt also has moved for affirmative summary judgment on the claims asserted by it in its counterclaim. The factual underpinnings of Vanderbilt's counterclaim may be quickly summarized.

16

Beginning in March of 2003, Vanderbilt asserts that Cordry sold eight new manufactured homes (homes that Vanderbilt had a security interest in) without paying any monies to Vanderbilt. In fact, the AGREEMENT assumed by Vanderbilt granted it a continuing security interest in all of Cordry's inventory. As such, the AGREEMENT required Cordry to hold all collateral financed by Vanderbilt (and DFS prior to the assignment) to be held "in trust" for Vanderbilt (and DFS prior to the assignment). With regard to monies received by Cordry, the AGREEMENT expressly stated:

> [Cordry] will immediately pay DFS [Vanderbilt following the assignment] the principal indebtedness owed DFS [Vanderbilt following the assignment] on each item of Collateral financed by DFS [Vanderbilt following the assignment]. . . . [Cordry waives all rights of offset and counterclaims [Cordry] may have against DFS [Vanderbilt following the assignment].

Between March 24, 2003 and May 31, 2003, Cordry sold eight new manufactured homes that had been financed by DFS or Vanderbilt. Cordry did not pay any of the money received from these sales to Vanderbilt. At the present time, Vanderbilt alleges that the total charges, excluding attorneys' fees, associated with the sale of these eight manufactured homes is $358,044.21. Cordry asserts that the total charges, excluding attorneys' fees, associated with the sale of these eight manufactured homes is $322,464.74.

In its counterclaim, Vanderbilt asserts that it is entitled to damages related to the sale of these eight manufactured homes. Specifically, Vanderbilt's counterclaim has raised a claim of breach of contract [Count I], money had and received [Count II], action on account [Count V], account stated [Count VI] and breach of fiduciary duty [Count VII]. In essence, Cordry makes the same argument in opposing Vanderbilt's motion for summary judgment on each counts, to wit:

17

> Since Vanderbilt materially breached the Agreement first, its
> motion for summary judgment should be denied.

In light of the Court's conclusion that Vanderbilt did not breach the AGREEMENT or the ADDENDUM, it is evident that Cordry's defense is legally insufficient. As such, the Court grants summary judgment to Vanderbilt on the liability issues raised in Counts I, II, V, VI and VII of its counterclaim. Because factual disputes remain between the parties regarding the damages associated with those counts, the Court suggests a telephone conference with counsel for the parties to discuss whether a trial on damages alone will be necessary or whether the parties can resolve the damage issues short of trial.[6]

For the foregoing reasons, it is

**ORDERED** that *Plaintiff's Motion For Summary Judgment*, filed March 11, 2005 (Doc. #105) is **DENIED** and *Defendant's Motion For Summary Judgment On Each Of Plaintiff's Claims And As To Each Of Defendant's Counterclaims*, filed March 11, 2005 (Doc. #102) is **GRANTED**. Accordingly, it is further

---

[6]The Court assumes that in light of the summary judgment ruling, Vanderbilt no longer seeks the relief sought in Count III [for an accounting] and Count IV [injunctive relief].

**ORDERED** that judgment is entered in favor of defendant Vanderbilt and against plaintiff Cordry on plaintiff''s claims and in favor of defendant Vanderbilt and against plaintiff Cordry on Counts I, II, V, VI and VII of defendant Vanderbilt's counterclaim.

      */s/ John T. Maughmer*
**John T. Maughmer
Chief United States Magistrate Judge**